UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re

BETTA PRODUCTS, INC.,                          No. 03-10925

                         Debtor(s).
_____/

BETTA PRODUCTS, INC.,

                         Plaintiff(s),

             v.                              A.P. No. 05-1046

DISTRIBUTION SYSTEMS AND SERVICES,
INC., aka DSS,

                         Defendant(s).
_____/

Memorandum of Decision After Trial
_____

       Prior to its Chapter 11 filing and for a period of time thereafter, plaintiff Betta Products, Inc.("Betta"), was in the business of selling paper and party products to retailers. It entered into a contract with defendant Distribution Systems and Services, Inc. ("DSS"), whereby all of Betta's inventory would be stored in DSS's warehouse. As Betta ordered products from manufacturers, it would be sent to DSS. As Betta received

orders from its customers, it would forward the orders on to DSS who would retrieve, pack and ship the ordered items to Betta's customers. Without rehashing the tortured procedural history of this adversary proceeding, the remaining issues are whether DSS negligently performed its duties under the contract or converted any of Betta's inventory.

It is important to note that Betta's inventory consisted of hundreds of different items and millions of individual pieces. New shipments arrived and orders were filled on a daily basis. Keeping track of so much inventory was a monumental task which DSS performed well before bankruptcy. There were inevitable mistakes and missing items, but nothing of serious consequence. The contract between Betta and DSS provided for a certain percentage of loss. DSS maintained a perpetual computer inventory, augmented by periodic physical inventories. There were inevitable discrepancies between the perpetual and physical inventories, with counts adjusted to match the physical inventory. Betta considered any discrepancy of less than $1,000.00 per item to be inconsequential. This could result in acceptable write-downs of inventory well into six figures, as the total value of the inventory was in the range of $10 million to $12 million.

Betta filed its Chapter 11 petition on April 15, 2003. Its inventory, pledged as security to Wells Fargo Bank, was cash collateral as defined in § 363(a) of the Bankruptcy Code. While the use of cash collateral is often a routine matter in Chapter 11 cases, it was not in Betta's case; both Wells Fargo and another principal creditor opposed Betta's request to use its inventory. After considerable wrangling, Betta obtained leave to use the inventory on terms it felt were unreasonable. Betta then decided to in essence call Wells Fargo's bluff by abandoning its inventory to it. This abandonment created the situation which culminated in this adversary proceeding.

By the time Betta abandoned its inventory to Well Fargo on July 25, 2003, it had purchased a great deal of postpetition inventory which was not subject to the Wells Fargo lien. DSS suddenly found itself in the middle of wrangling between Wells Fargo and Betta as to exactly what part of the inventory on its premises belonged to Wells Fargo. To complicate things, Betta continued to instruct DSS to fill orders from inventory supposedly abandoned to Wells Fargo and Betta made several deals with Wells Fargo to purchase some items of "its" inventory. DSS received confusing and contradictory instructions as to what it was supposed to

2

do. In the words of Betta's CEO, "what a mess."

Eventually, DSS was given a list of inventory items to be send to Wells Fargo's agent. Wells Fargo sent a representative to oversee the packing and shipping of these items. Betta also sent a representative, who instructed DSS not to ship a considerable quantity of items on the grounds that they had been purchased by Betta after its bankruptcy filing. Not surprisingly given what had gone on after the filing, the inventory actually received by Wells Fargo was "short." Eventually, after more wrangling, Betta settled with Wells Fargo and obtained Wells Fargo's supposed rights against DSS.

Around May of 2004, Betta terminated its contract with DSS and instructed DSS to send designated items of its inventory to other warehouses. This left a large amount of Betta property in DSS's possession. Officers of DSS repeatedly contacted Betta's CEO to take these items, and were told by him that Betta "had everything it wanted" and did not need or want the rest. In order to satisfy its outstanding claim under the contract, DSS sold the remaining inventory of Betta to a liquidator for $50,000.00.

Shortly thereafter, Betta ceased business operations. Its confirmed Chapter 11 plan provided for the payment to creditors by the prosecution of adversary proceedings, including this one. This adversary proceeding is actually prosecuted by a litigation trust established by the plan. It seeks damages for alleged shortages of inventory to Wells Fargo and Betta in the approximate of $400,000.00, plus consequential damages.

After listening to seemingly endless and often incomprehensible testimony, the court is in no way convinced that DSS has done anything actionable. As to the claim assigned by Wells Fargo, it is abundantly clear that Betta itself was responsible for Wells' Fargo's shortages by continuing to sell Wells Fargo's inventory even after it had supposedly been abandoned and by arbitrarily removing items from Wells Fargo's shipment on the grounds that these items had been purchased postpetition.

Betta's conduct of this case was less than exemplary. Its CEO and other knowledgeable persons had long since departed the scene, and Betta attempted to prove its case using its former bookkeeper/controller, who testified for two full days using an incomprehensible array of lists created from computer-generated perpetual inventories even though both sides agreed that given the huge volume of goods and transactions only

3

a physical inventory, which was never done after filing, was the only reliable way to determine the actual inventory. She augmented her lists with calculations she could not explain and appeared not to understand herself. She concluded all of her testimony without specifically identifying a single napkin that was missing. Out of sheer frustration, the court picked at random one item on her list of missing inventory, some 20,000 "jeweled tiaras," with a cost of 37 cents each, which DSS supposedly had on hand and was supposed to ship to Wells Fargo but did not. When DSS produced the documents accounting for these tiaras, Betta mentioned for the first time that it knew its list was in error and had a corrected list. No mention was made of this when Betta moved for admission of the list (Exhibit 4). This and other incidents completely destroyed any credibility of Betta's witness, even if the court had understood her convoluted testimony.

After considering all of the evidence, the court is convinced that DSS performed its obligations under its contract with Betta properly and without negligence. The considerable confusion surrounding the state of its inventory was caused by Betta's decision to abandon its inventory to Wells Fargo and its failure to have a physical inventory conducted at any time after it filed its Chapter 11 petition. Betta itself caused the shortages to Well Fargo and displays unmitigated gall by blaming them on DSS.

There is no evidence that DSS converted any of Betta's inventory. Betta knew that it had left a large amount of inventory in DSS's possession after it had terminated the contract, and Betta simply did not want it. DSS acted in a commercially reasonable manner in disposing of these items. Betta displays even more gall by suing DSS for failing to return these items to it. The court finds Betta's argument that it did not know about the left-over inventory to be completely unsupported by the evidence.

For the foregoing reasons, Betta will take nothing by its tort claims. DSS shall recover its costs of suit.

This memorandum constitutes the court's findings and conclusions pursuant to FRCP 52(a) and FRBP 7052. Counsel for DSS shall submit an appropriate form of judgment forthwith, which shall include the award of the arbitrators on Betta's contract claims.

Dated: April 11, 2008

1
2                                      _____
                                       Alan Jaroslovsky
3                                      U.S. Bankruptcy Judge
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

5